**STATE HIGHWAY COMMISSION of Wyoming, Appellant (Defendant below),**

v.

**GARTON AND GARTON, INC., Appellee (Plaintiff below).**

No. 3454.

Supreme Court of Wyoming.

July 12, 1966.

John F. Raper, Atty. Gen., Glenn A. Williams, Asst. Deputy Atty. Gen., and F. J. Wendt, Sp. Asst. Atty. Gen., Cheyenne, for appellant.

Miller, Suyematsu, Crowley & Duncan, Kline & Tilker, Robert L. Duncan and James A. Tilker, Cheyenne, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

Garton and Garton, Inc., filed a three-count complaint against the State Highway Commission of Wyoming for amounts claimed to be due on three separate 1958 contracts for highway work in the State. In the pleadings, as amended prior to the trial, plaintiff claimed in the first count, concerning Wyoming Project I–90–1(2) 18 in Sheridan County, embraced by contract of August 22, 1958, the sum of $44,997.79, comprised of $43,360.16, resulting from the defendant's alleged prolongation of the time for completion of the contract; $754.02 for the required payment of another contractor because of defendant's fault; $103.61 caused by erroneous staking of locations; and $780 liquidated damages theretofore deducted by the defendant for an overrun on completion time of the contract. Defendant admitted the contract and the withholding of the amount for the overrun but denied the remainder of the allegations. In the second count, relating to a contract of August 29, 1958, Wyoming Project I–90–2(9) 66, Johnson County, plaintiff claimed that defendant had caused berms and embankments to be built requiring additional work to plaintiff amounting to approximately $29,000; that plaintiff was improperly required to replace certain columns to its damage of approximately $2,500; and that $1,500 had been improperly withheld for overrun time. The defendant again admitted the contract, and the withholding for overrun time, but denied the remainder of the allegations. The third count, relating to a contract of October 23, 1958, Wyoming Project I–90–4 (7) 185, Crook County, alleged the defendant's requiring the use by plaintiff of a greater quantity of cement than that stated in the specifications, to its damage of some $5,000; that the plans and data furnished by the defendant showed a different condition of materials to be encountered than those found in actual excavation, requiring additional expense, to its damage of some $60,000; and that $2,200 had been withheld by the defendant for an overrun in time for performance of the contract. Again defendant admitted the contract and the withholding, but denied the other allegations.

The cause was tried to the court without a jury, which made findings of fact and conclusions of law, hereafter to be discussed, and entered judgment of $9,908 on the first count; $15,000 on the second; $29,489.79 on the third; and ordered the sum of $4,090 previously deducted by the defendant and assessed to be recovered by plaintiff, from which judgment defendant has appealed, urging various errors. Since the three counts of the complaint are for all practical purposes three separate litigations, each will be examined in turn.

## COUNT I

Defendant charges error in (a) the court's finding that there was an implied contractual obligation on the part of the defendant to have the sites available and ready so that plaintiff might work them simultaneously and that failure so to do constituted a breach, (b) the court's finding that plaintiff was unnecessarily delayed by defendant in the driving of piling, necessitating the subcontracting for such work at a subsequent date; and (c) that, with the exception of

the court's holding as to the erroneous staking (for which $103.61 was awarded), the findings and conclusions were contrary to fact, unsupported by the evidence, and contrary to law.

The crux of the court's findings, as to Part A of Count I, was that plaintiff was precluded from constructing the Tongue River bridge and the Monarch and Jensik interchange structures in a more or less simultaneous manner; and the conclusions of law:

"That the Defendant was under an implied contractual obligation to have the structure sites in a reasonable state of readiness for the Plaintiff to work; that the Defendant was remiss in its failure to seasonably require its grading contractor * * * to do the necessary grading work on and around the proposed bridge structure sites; that the Defendant's failure of cooperation and the failure of the Defendant to have the premises in a state of readiness constituted unnecessary interference with the work of the Plaintiff so as to authorize recovery for the delay caused the Plaintiff nothwithstanding the 'no damage' provision in the contract between the Plaintiff and Defendant; that the proposal, bid and description of work in the contract sets forth work to be done as one unit and not as separate and divisible units; that the Plaintiff in making its bid was entitled to rely on said description of work and to work on all of the structures simultaneously, or approximately so, as one unit; that the foregoing acts and omissions by the Defendant constituted a breach of the contract; that as a result of the breach of the contract, the Plaintiff incurred additional work and costs, labor supervision and equipment in the sum of $9,050.37."

Unfortunately, neither party addressed itself to the point that the contract called for the simultaneous construction at the three sites and that plaintiff was precluded therefrom. Instead, the defendant cites a general statement from 6 Williston, Contracts, § 1932 (rev. ed. 1938); Annotation, 84 A. L.R.2d 1229; 12 Am.Jur. Contracts § 370; and 13 Am.Jur.2d Building and Construction Contracts § 54—all dealing with the impossibility of performance rather than with the implied contractual obligation, the focal point of the court's findings.

In both the oral argument and brief, the parties alluded to the court's conclusion that the defendant was under "an implied contractual obligation" to have the structure sites in a reasonable state of readiness for plaintiff. In that regard, it may well be noted that these quoted words and those of similar import are variable terms, 3 Corbin, Contracts, § 561, ff. (1960), which fact was probably an underlying reason for the trial court's applying the principle that the defendant should have been in reasonable readiness for the contract to be consummated. Manhattan Fireproofing Co. v. John Thatcher & Son, E.D.N.Y., 38 F.Supp. 749; Mansfield v. New York Cent. & H. R. R. Co., 102 N.Y. 205, 6 N.E. 386. This principle we approve, but it does not provide any solution to the question here in issue, i. e., Does a contractee by implication agree that his affairs are in readiness for one with whom he covenants to embark simultaneously on all work referred to in a single contract?[1] The plaintiff so contends, but justifies its rationale by saying that the contract is one unit and indivisible, citing Baker v. Jones, 69 Wyo. 314, 240 P.2d 1165, for the rule that the intention of the parties controls the divisibility of the contract. However, as we see it, divisibility of the contract is not germane to the quaere or determinative of it, so that in effect we have

1. The exact language of the contract here involved was, "The Contractor shall perform the work of construction of 1 service road bridge consisting of 3 continuous wide flange girder spans over the Tongue River and 2 interchange structures, one consisting of 4 continuous wide flange girder spans and one consisting of twin 3 continuous reinforced concrete slabs and miscellaneous work on 3.141 miles of the Sheridan-Ranchester road from Monarch south * * *."

been furnished no legal support for plaintiff's contention that it had a right to work the sites simultaneously. Plaintiff faces further difficulty in supporting its allegation since there was no substantial evidence introduced to show that the contractor, either from the standpoint of manpower or equipment, was in a position to work the sites simultaneously. The Annotations at 70 L.Ed. 438 and 91 L.Ed. 48 report the great weight of authority as supporting the rule that, in the absence of stipulations in the contract which preclude recovery, a contractee is liable for delays resulting in damage to his contractor but say that the cases are not in accord as to the liability of the contractee to the contractor in damages for delay due to the default of another contractor of the contractee. Although in the instant case it could be argued that the specific provision of the contract that no charges would be made by the contractor for hindrance or delay from any cause precluded recovery, the trial court's determination was to the contrary and such conclusion is not within the appeal. Pertinent to the contention that plaintiff was entitled to work all three sites simultaneously is the Annotation at 115 A.L.R. 65, 70–71: "The general rule, that [in the absence of contract provisions to the contrary] a building or construction contractor has the right to recover damages resulting from the delay caused by a default of the contractee * *, assumes that there was a delay in the work of the contractor, that the contractor was damaged by the delay, *that there was a default by the contractee, and that the contractee's default was the cause of the contractor's delay.* When any of these conditions were absent, recovery of damages by the contractor has been denied." (Emphasis supplied.)

▮ Analysis of the evidence shows that in September 1958 when defendant asked that the contractor commence building the bridge across the Tongue River, and at different times thereafter, plaintiff's superintendent requested the defendant's engineers to make the Jensik and Monarch sites available, to which requests the engineers responded with indefiniteness, indicating availability of the requested sites at some later time; but for various reasons, the Jensik site was never accessible to plaintiff until March 1959, and the Monarch site, July 1959. It also shows that plaintiff had planned to work on the various parts of the project simultaneously and had such been possible the work could have been done less expensively and the contract completed in time; that plaintiff was delayed by the grading contractor; and that as to the Monarch structure the engineer could have declined to charge time against the plaintiff or charged time against the grading contractor. However, the record fails to show that plaintiff requested the grading contractor to co-operate, and there is an absence of proof concerning the relationship between the two contractors except for an engineer's hearsay report of hard feelings between them. Undoubtedly, a loss was suffered by plaintiff because of the lack of readiness of the Jensik and Monarch sites, but for all that appears, such loss might have been avoided had plaintiff followed the procedure outlined in § 105.7, State of Wyoming Highway Department, Standard Specifications (1956 ed.), which required co-operation of the contractors, subject to the privilege of referring any dispute to the engineer as a referee, his decision to be final and binding on all. We think that such steps were requisite to any recovery. It might well have developed in the refereeing process that the grading contractor's delay was on account of a compelling reason, which would have excused the lack of readiness; that the plaintiff itself was not in fact ready; or that any one of divers circumstances existed which would have made plaintiff's demand untenable. Of course, this provision as to the availability of defendant's engineer as a referee should not be confused with active direction of the contractors prior to the time that they have attempted to resolve their own difficulties. It may also be said in passing that the phrase in the specifications providing

that the referee's decision "shall be final and binding on all" is only relative and any such determination would certainly be subject to review by the courts as to any abuse of discretion. Although the plaintiff may conceivably have been injured without its fault and by the improper conduct of the defendant, there is no sufficient showing that steps had been taken which would warrant a recovery against the defendant on this count. Even had plaintiff alleged what its evidence at the trial tended to show, that it desired to work alternately on the three sites, rather than all of them simultaneously, and was permitted by the defendant in the early stages to work only on the Tongue River bridge, and the pleadings were liberally construed as being amended accordingly, there would still be insufficient proof to substantiate its allegations of injury because this hinged on co-operation between contractors and an attempt to alleviate any lack thereof. As already noted, § 105.7 of the specifications required a contractor, before complaining of injury, to have requested any dispute to be settled. Here no reason has been advanced why plaintiff should be permitted to by-pass such a provision, apparently accede to the arrangements that it should commence with the Tongue River project in the first instance and after work was completed make a claim.

As to Part B of Count I (plaintiff alleging it was unnecessarily delayed by defendant in the driving of piling and the trial court concluding that this delay was an active interference and a breach of contract), the record discloses that plaintiff's pile driver after finishing his work on the Jensik site was not permitted to go on to the Monarch site, since it was not ready for such work. Defendant says that this is merely an extension of the matter considered in Part A of Count I. Plaintiff's position is that the defendant should have enforced § 105.1 of the specifications, dealing with the authority of the engineer, and directed the work of the grading contractor in a manner that would not cause inter-ference and delay to plaintiff. As we have already noted in our discussion of § 105.7 of the specifications, such a provision should not be confused with active direction of the contractors prior to the time that they shall have attempted to resolve their own difficulties. Again, the record fails to show any requests of plaintiff to the grading contractor to have the Monarch site ready at the time it wished to have the pile driver work there and thus no evidence appears to warrant the trial court's finding for plaintiff.

As to Count I, the trial court's judgment is reversed except for the award of the $103.61, which, as above noted, is not contested.

## COUNT II

Since the court made no award concerning plaintiff's claim of being improperly required to replace certain columns, this portion of the appeal, except as to overrun time, is addressed to the alleged breach of contract by the defendant's causing "berms and embankments to be built upon the job location by a grading contractor prior to the commencement of this contractor's work, causing extra work * * * and additional costs" to its damage, the court in that respect finding:

"* * * the Defendant permitted its grading contractor * * * to place an embankment on the east side of the site of the bridges to be built by the Plaintiff; that the said grading contractor built the embankment on the site prior to the time the Plaintiff was able to commence work on the bridge structures; that a 'special provision' in the contract between the Plaintiff and Defendant stated in part as follows: 'The grading contractor will be required to excavate for the interchange and channels at the bridge site before any other grading work is done. After the bridges are completed, the grading contractor shall build the berms and embankment at the bridge ends'; and that contrary to said special provision, Defendant permitted the plac-

ing of the embankment upon the structure site by the grading contractor, which hampered the Plaintiff in the construction of the pier footings and columns; causing additional work to the Plaintiff and additional costs of excavation, concrete placement, labor, supervision, and equipment."

Defendant's position on this aspect of the case is that, although plaintiff alleged interference with or an actual breach of contract, it has not shown where the contract provides for controlling the subject matter of its complaint and that no competent evidence was presented to show a violation of the special provision. Plaintiff insists that, at the time it moved into the area, filling had already been done by the earth contractor; that the defendant admitted there was a discrepancy between the special provision in plaintiff's contract and the construction note on its structure plans; and that it was also admitted by the defendant that plaintiff was hindered in the performance of its contract by the fact that the approach fill slope on the east side came down into the area of the excavation for piers and had to be dozed out before they could be constructed. Thus, from plaintiff's argument there are two bases for its position: (1) the discrepancy between the special provision in the contract and a construction note on its structure plans; and (2) at the time it started excavation for footings the approach fill slope on the east had to be dozed out. Before a discussion of these points, it may be well to clarify the physical layout. This particular interchange structure called for two bridges on the Buffalo-Gillette road. Work was first commenced on bridge number two, in the west-bound lane, and secondly on bridge number one, in the east-bound lane. For each bridge there were two bents, running northeast to southwest (on this job a bent consisted of three columns, one immediately beyond the other—a cap beam being placed on top of them). The excavations for the concrete footings upon which the bents were superimposed were approximately fourteen feet in depth.

As to plaintiff's first point, interrogatory two asked defendant "whether or not the grading contractor was required by defendant to install berms before plaintiff was permitted to build abutments." The answer thereto was yes, and interrogatory three was, "state why grading contractor was required to do so." The response to be meaningful must be considered in its entirety:

"The abutments were placed on piling. If the piling had been driven before the berms were placed it would have been highly impractical to build the berms around the piling. A construction note on the structure plans states, 'materials that will hinder or prevent the placement of piles shall not be used in fill at bridge ends.' This same note appears on the grading contract plans. There is, however, somewhat of a discrepancy between the note on the plans and the special provisions in the contract. The special provisions in the contract states, 'the grading contractor will be required to excavate for the interchanges and channels at the bridge sites before any other grading work is begun. After the bridges are completed the grading contractor shall build the berms and embankment at the bridge ends. Drainage structures such as embankment protectors or median drains shall be built by grading or surfacing contractor as shown on the Plans or in the Proposal,' dated November 22, 1957. That the berms would have to be built first is borne out by a letter from Mr. Anderson to Garton & Garton dated September 26, 1958. In part 'the only part of these upon which the structure does not depend on some measure of grading first, would appear to be the piers for the twin US 16 interchange structures at Station 122+09 of the above captioned project. (I–90–2(9) 66 Str.) The others, and the abutments of these structures, seem to depend on excavation and/or embankment by the grading contractors previous to the start of construction. Grading has started on the

I–90–2(9) 66 contract but not on the I–90–2(7) 65 one. If you care to start on the piers of the US 16 interchange structures, we ask that you give John Jobe at Buffalo 48 hours advance notice so that he can get them staked out for you.' "

According to the exhibits, the abutments of the bridge in question occurred at either end of the structure and were placed on pilings—the two bents being placed between the abutments. As stated in the answer to the third interrogatory, there would appear to be "somewhat of a discrepancy" between the note on the structure plans, which indicated that materials hindering or preventing the placement of piles should not be used in the fill at the bridge ends, and the contractual provision that the berms and embankment at the bridge ends would not be built until after the completion of the bridge. However, the existence or nonexistence of any claimed discrepancy in this regard is unimportant unless the berms and embankment *at the bridge ends* were the cause of plaintiff's damage. This circumstance points up the basic difference in viewpoint of the parties concerning this special provision. Plaintiff appears to contend that there should have been no filling by the earth contractor in the area where it had to excavate trenches for footings. Defendant's interpretation is that the earth contractor was free to bring in the approach fills and that the special provision limited the berms and embankment only *at the bridge ends*. A review of the record discloses no evidence stating directly that any of the damage or inconvenience claimed to be suffered by plaintiff was caused by the berms and embankment at the *bridge ends*. It is, of course, possible that had the earth contractor been prevented from placing berms and embankment where the bridge abutments were to be located no portion of the approach fill would have been brought in and therefore the plaintiff would have had no interference with its access to the area where it was building trenches; but such a possibility is no substitute for evidence. It follows that the basis of damage stated in the findings of fact, i. e., the violation of the special provision, was not supported by sufficient evidence, and the judgment may not stand. We are precluded from considering whether or not the court would have been warranted in finding that defendant violated an implied agreement not to interfere with the contractor's work on the ground mentioned in the second portion of plaintiff's argument since the findings of fact make no allusion to this point, and a judgment cannot go beyond the findings in awarding relief. Pryor v. Pryor, 197 Okl. 85, 168 P.2d 875; Mason v. Mason, 108 Utah 428, 160 P.2d 730.

As to Count II, the trial court's judgment is reversed.

## COUNT III

Part A of the third count of the complaint stated that the defendant required plaintiff to use a greater quantity of cement in the concrete mix than was required under the specifications on the project, resulting in additional costs, labor, material, equipment, and overhead, to its damage in the sum of $4,489.79. The court allowed the full amount.

The facts are uncomplicated, the defendant having made up the formula or design of the concrete mix, arranged to have its inspector at plaintiff's batch plant, and told plaintiff's superintendent how much rock, sand, cement, water, and protex to put in each mixture—the inspector determining from day to day the moisture content of the aggregate and instructing plaintiff's superintendent as to the formula for the mix. Everyone agreed that the richness of the mixture depends upon various circumstances, including the nature of the sand, the atmosphere, and other factors. Test cylinders were taken from the concrete at intervals by the inspector and forwarded to the Cheyenne office for testing, which required approximately twenty-eight days. After a certain amount of concrete had been poured, the defendant's inspector told plain-

tiff's superintendent that it was necessary to do something to bring the test cylinders up, referring to certain sections of the specifications, and that they would have to do that or tear out the work that had already been done, ordering plaintiff to put in an extra sack of cement per cubic yard to bring the concrete up to the required strength. This was done for several months until the inspector said that the extra cement was too much and that the additional sack ordered should be cut to a half-sack per cubic yard. Plaintiff's evidence delineated the cost of the extra amounts used by reason of the inspector's request to be that alleged in the complaint and allowed by the court. Defendant's inspector denied that he ordered the plaintiff to put the additional cement in each batch of mix, indicating that plaintiff was the one who strengthened the concrete and was responsible for the expense.

 The argument on appeal that it was the decision of plaintiff's employee to add additional cement carries no force, defendant itself in the brief indicating the difficulty of its position on appeal since it was a question of one man's word against another's. Under the well-settled rule, the credibility of witnesses is a matter for the trier of fact, and the testimony of plaintiff's superintendent was sufficient basis for the trial court's finding.

The judgment in this aspect is correct and is affirmed.

In Part B, Count III of the complaint, plaintiff asserted that the plans for the Crook County project, prepared and furnished by the defendant, stated foundation data and results of two test holes in the working area where the contractor had to excavate, showing a subterranean condition of "sand and gravel, and clay," upon which plaintiff relied in bidding the job, and that in actually excavating the ground plaintiff encountered a condition of "river-bottom muck" rather than the materials shown on the plans, resulting in great damage. The court in its findings of fact stated:

"That the Defendant prepared the plans for said project * * * [and thereon] set forth * * * the foundation data and results of test holes * * * showing a subterranean condition of sandy clay (soft) and clay (soft) and sand and gravel; that Plaintiff properly relied upon the data furnished by Defendant in making its bid; that upon the actual excavation by the Plaintiff at the site of test hole No. 3, a different material was encountered by Plaintiff; that the material actually excavated by the Plaintiff was 'river bottom muck' which was not originally discoverable by visual inspection, but which could have been discovered by Defendant in its initial drilling; and that neither party actually knew of the true condition of the river bottom muck at the time of entering into the contract; that said changed condition was material to the work required; and that as a result the Plaintiff incurred additional work and costs of labor, supervision and equipment."

The trial court's conclusion of law was:

"That the changed subterranean condition and the action by the Defendant in negligently furnishing the Plaintiff with misleading and erroneous soil test data caused Plaintiff to incur additional work and costs * * * to the Plaintiff's damage in the amount of $25,000.00."

At the inception of our consideration of this matter, it must be noted that plaintiff did not allege in its complaint any fraud, misrepresentation, or withholding of information on the part of the defendant as to the boring data, and now presents in its brief, as possible theories substantiating its recovery, the doctrine of mutual mistake, implied warranty of fitness, substantial constructive fraud, and reliance and warranty.

Defendant's principal contention is that it did not expressly or impliedly warrant or guarantee the subsurface conditions of the construction site, where it fully and truthfully informed the contractor of the test results, and where § 102.5 of the specifica-

tions expressly provided that the plaintiff was to investigate and satisfy itself as to the conditions which might be encountered,[2] and that such information, data, and tests are not a guarantee or warranty and cannot be blindly relied on by a contractor. Defendant also contends that the findings and conclusions are contrary to fact, not supported by the evidence, and are contrary to law.

Plaintiff's response is dual, first presenting certain cases tending to hold that a contractor is not bound at his peril to conduct his own tests on subsoil conditions, under such a provision, and second, arguing that the test-hole data was misleading to plaintiff's damage.

It would suffice little to pursue defendant's principal contention since the authorities seem to bear out the general principle:

"* * * The rule is that where plans and estimates or specifications given out by authorized public authorities as the basis for bids for public work lead an intending public contractor reasonably to believe that conditions indicated in such plans and specifications exist, and may be relied upon in making his bid, may recover on a quantum meruit compensation for extra work or expense made necessary by conditions being other than as represented therein. This rule is especially applicable where the representation as to conditions is positive, in which case the right of the contractor is not affected by general language of the contract to the effect that he is expected to investigate facts for himself. * * *." 43 Am.Jur. Public Works and Contracts § 111.

On this subject, the Annotation at 76 A.L.R. 268 analyzes many of the cases cited by the litigants. The claim turns, therefore, upon the question of whether or not the test-hole data led the plaintiff reasonably to believe that the conditions would be different from those which it actually encountered and that it was damaged as a result.

An examination of the record discloses the following matters pertinent in ascertaining whether or not there was sufficient evidence upon which the court's findings of fact and conclusions of law could rest.

The general plan for the bridges over Houston Creek furnished plaintiff by defendant (Plaintiff's Exhibit 7) showed the following stream data: "Drainage Area, 40 Square Miles; Slope of Streambed, 0.003 ft./ft.; Scour, Some at maximum flood; Drift, Small limbs; Description of Streambed, Sand and gravel." At maximum flood the area of water section was given as 550 square feet; the coefficient of roughness, 0.0275; hydraulic radius, 7.0 feet; velocity of flow, 10.8 feet per second; and the discharge, 6,000 cubic feet per second. The total estimated quantity of wet excavation for bridge one was 280 cubic yards; dry excavation, 80 cubic yards. Although Exhibit 7 showed the data for three test holes, the complaint made reference only to two, and the findings of a single test hole, No. 3. Test Hole 2 was made to the extreme left of the channel bottom of the creek, at a point to the right of where the left bent of bridge two was to be placed—the ground elevation there being approximately 4,285 feet. Test Hole 3 was made to the extreme right of the channel bottom at a point slightly to the right center of where the

2. "102.5. Examination of Plans, Specifications, Special Provisions, and Site of Work: The bidder is required to examine carefully the site of the proposed work, the Proposal, Plans, Specifcations [sic], Special Provisions, and Contract forms before submitting a Proposal. The submission of a bid shall create the presumption that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the Plans, Specifications, Special Provisions, and Contract. He shall have no claim for damages, or an extension of time herein specified for completion of the work, or any other concession, because of any misunderstanding, misinterpretation, or lack of information relative to this contract or the work proposed in the Plans or Specifications." State of Wyoming Highway Department, Standard Specifications (1956 ed.), pp. 11–12.

right bent of bridge one was to be placed—the ground elevation there being approximately 4,292 feet.

The data of Test Hole 3 indicated the following in sequence, top to bottom: sandy clay (soft), clay (soft), sand and gravel (one-half inch maximum), gray shale (medium hard), gray siltstone (hard), and gray clay shale (medium hard). As we interpret Exhibit 7, the "sandy clay (soft)" ran from the surface to a depth of four feet and was underlaid by three feet of "clay (soft)," and therafter there occurred the sand and gravel. Thus, there was no representation of sand and gravel until the depth of seven feet.

Defendant's engineering geologist testified that to the best of his knowledge the test holes were drilled in August 1958. This, of course, would have been well past flood stage, which would normally occur in May and June. Plaintiff's superintendent said that they started working at the bridge site the middle of May, excavating for the footings, rather than using sheet piling. Since plaintiff's work on other sites was well along, it did not want to wait until the Houston site had dried; and its employees went in and dammed the creek, pumping the water around the area to be worked, hoping to dry the site. They also dug a sump hole at the lower end of the bridge site and put in another pump. Plaintiff's superintendent testified that "had it been sand and gravel, I could have decreased that water level considerably by pumping out of the sump hole which would have given me a dry—not a dry—but a solid surface *on which to work down* in these trenches." (Emphasis supplied.) This witness said that in the vicinity of Test Hole 2 they were able to set their forms up on fairly solid ground but from there hit muck. Previously when the witness had been asked what soil he got into, he answered, "I got into a silt, a soft runny silt, that was nearly a quick sand, that flowed with the water. I didn't find any sand and gravel that would make a solid bed in any way to set my footing forms on." He said the silt

was found from the ground level down, that after the first six inches of the surface had been taken off you could see the ground begin to give to such an extent they were unable to get a dozer or any equipment in and had to build mats. His testimony as to the building of the mats and the removal of the muck was as follows:

"Q What are the mats? A Well, actually what we done was to take some three by tens, three by twelves, and bolt them together about three thicknesses of them. These was about, oh, about eight by tens, maybe eight by twelves in size, and we used those to put down on the ground so that this large machinery could crawl upon them to distribute the weight to keep them from sinking down in the muck.

"Q How was the muck removed from the site and from the forms that were used to build the bridge in this area? * * * A From the inside of my form, after I had pushed my form down in this mud, I used buckets. I had a man down in there with hip boots on, and a man standing up on the form, and they would get this mud in buckets and dump it over the outside."

The witness could not say how far down they dug for the footings; he did testify that the plans showed how far they should have dug and that they tried to hold to that elevation; Plaintiff's Exhibit 7 would indicate that the depth of the footing was about seventeen feet below the ground surface. The witness was unable to say how many cubic yards of wet excavation were removed, "because it wasn't all taken out at one time. Plus the fact that this bank kept sloughing off as we took this river silt out. I would rather call it a silt, flowing silt, or a quick sand. As quick as we took it out it kept falling in from the sides, and this cavity underneath the embankment, and even into the center, between the two holes, or what would have been the two holes, the two bents, and then these banks were sloughing back in. We had to dig this all out again. We shored these banks back·

and tried to hold them back, but this mud would creep through. I don't doubt for a minute that a lot of this silt just flowed down the creek underneath the ground into our excavation and right on down to the lower end, and we picked it up and took it out."

Plaintiff's superintendent had not, prior to going on this bridge job as superintendent, had previous experience in working with bridges that were based on test-hole information, although he had done excavation depending on such data. Asked by defendant's counsel what was the difference between his definition of wet excavation and river-bottom muck, he answered:

"Well, wet excavation is merely excavation that you have to dig out of water, and there is still water in your hole, when you get the dirt or gravel, or whatever it is, coming out; when that comes out, the water is still down there, this is wet excavation. The excavation itself is wet. And when I speak of excavation, that is the hole that is left, *not the material that is taken out.* This river muck that you spoke of, or this silt that is a flowing mud, it is not—this excavation is not wet, it is full of this flowing muck, as a quick sand." (Emphasis supplied.)

Defendant's inspector, called as a witness by plaintiff, had viewed the excavation at the Houston site but did not know the depth of the silt nor the depth when gravel had been reached, indicating that "this was rather hard to determine, in the manner in which this big machinery had been in there working, they had it pretty well mixed up." According to plaintiff's superintendent the silty clay or clay was nearer the type of material that he found continuously through the excavation; that, although there could have been a small amount of "sand or clay or gravel" in the areas other than Test Hole 2, for general purposes "there was no sand or gravel in there."

Mr. Jack R. Garton testified he had observed the "muck" in the bottom of Houston Creek and that "I don't know any other way to describe it. I have heard the old

cliche of 'too thick to stir and too thin to plow,' that is what he [plaintiff's superintendent] encountered." Mr. Garton indicated the importance of the soil test logs: "A sand and gravel condition, for example, you can lower the ground water table so that you can have a tolerable condition. And in this muck circumstance you could never separate the water from the soil so that you could pump and reduce the water level. * * * it was impossible to separate the water from the material, as you could do with a free-draining material, such as sand or gravel."

Defendant's engineering geologist testified that "wet excavation" would be a saturated-type soil, any type soil as long as it was saturated with water; not necessarily a moist or damp soil, but a soil where all of the pore spaces in the soil were actually filled with water, occupied with water.

According to the Chief Geologist for the Wyoming Highway Department, in situations similar to the damming of the Houston Creek site "you create a head on the water, a hydrostatic head, in other words, you build water above your excavation, then it creates what is known as a quick condition, regardless of the type of material. In other words, the water there has a head on it which forces it down, and it comes up underneath. So any excavation in an area of that type would be extremely difficult, because it is in a liquid state, essentially, and this is created by this head." No other witness testified on this aspect of the case.

Under this state of the record, we are doubtful that there was sufficient evidence that Test Hole 3 showing sand and gravel *at a depth of seven feet* was untrue. Apparently, the testimony as to costs of removing the silt or muck concerned the excavation from the surface down. As to the texture of the material above seven feet, it was shown as "sandy clay (soft)" and "clay (soft)," whereas the witnesses denominated it as "silt" or "muck," which presents a question of semantics. Webster's Third New International Dictionary (1961, G. & C. Merriam Company), pp. 2009, 418,

and 2119, defines sand as "a loose material consisting of small * * * grains usually less than two millimeters in diameter," "clay" as "earthy substance * * * less than .002 mm in diameter," and "silt" as "unconsolidated or loose sedimentary material whose constituent rock particles are finer than grains of sand and larger than clay particles." As to the definition of "muck," only that given in Webster's, supra, p. 1481, under 5a(1) and 6 would be here applicable, "dark usually black earth that is capable of absorbing much water * * * marked by the presence of organic * * * matter in an advanced state of decomposition," and "material removed in the process of excavating."

■■ We are doubtful that we would have been convinced that extra work and expense were made necessary by conditions being *other than as represented* in the estimates or specifications given by the defendant. Nevertheless, this matter was within the trial court's prerogative, and we are unprepared to hold that there was only a scintilla of evidence to show that plaintiff suffered injury on this account. We pass then to the damages award, and we have great difficulty in correlating the testimony with the amount allowed in the judgment since there is no breakdown of award stated, and as heretofore noted, the evidence concerning plaintiff's damages seemed to relate to additional costs because there was not sand and gravel from the surface down. Even so, there was admitted without objection certain ambiguous testimony conceivably sufficient to support the judgment. We, therefore, reverse and remand for new trial Part B of Count III.

## LIQUIDATED DAMAGES

■ Because of the reversal of the trial court on Counts I and II, the recoupment for liquidated damages in these two causes was improper and the judgment pertaining thereto must be reversed. As to the third count, the trial court should resolve the liquidated damages at the time of the retrial.

The judgment is affirmed as to Part A, Count III; reversed as to Count I, except for the award of $103.61; reversed as to Count II; reversed and remanded for new trial as to Part B, Count III.

HARNSBERGER, Justice (dissenting).

I must dissent from the opinion of the majority except as to the holding with respect to Part A Count III which is affirmed by the majority.

The conclusions reached in the opinion stem in principal part from the factual determinations by this court in substitution for those findings which were made by the trial court and were supported by substantial evidence. There was positive testimony showing that none of the three sites for bridge construction were available to the plaintiff to commence the performance of his contract at the time the same was awarded. Some of the sites were not made available for more than 11 months after the contract was signed, although plaintiff made numerous requests that the sites be readied for the bridge construction work. These requests were made both to the state highway department and to the dirt contractor. When these requests were made, the plaintiff was given a definite day by the highway department when the sites would be ready. Notwithstanding, the sites were never made ready at the appointed time. In addition, the plaintiff was prevented from performing certain activities necessary in connection with his bridge building contract, such as pile driving, and was ordered by the defendant not to do that work, and was in fact prohibited by the highway department from performing that necessary part of the plaintiff's contract. Through the actions of the State and of the dirt contractor, who was under the control and direction of the state highway department, the plaintiff was prevented from fulfilling its contract and was caused not only delay but also major additional expenses.

Under these circumstances it was the exclusive province and right of the court to believe the testimony in behalf of the plain-

tiff and to exclude from consideration all conflicting testimony offered in behalf of the state highway department. As the favorable testimony to the plaintiff was positive and substantial, this court should accept its findings and determinations, and we are violating a precept religiously adhered to in the past and for which there is shown no valid excuse now to change.

From my examination of §§ 105.1, 105.2, 105.4, 105.5, 105.7, and 105.8, State of Wyoming Highway Department, Standard Specifications (1956 ed.), all of which appear in the record, there is no doubt whatever that the highway department had complete and specific authority sufficient to require the dirt contractor to have the sites available when the bridge contractor was ready to proceed with his work.

Furthermore, the highway department knowingly contracted with the dirt contractor simultaneously and at the same time it contracted with the bridge contractor. The contract of the plaintiff on its face gave the bridge contractor the right to immediately proceed with the fulfillment of his contract inasmuch as the time limited within which to complete the same dated from the date of that contract. Inasmuch as the highway department knew that it was necessary for a considerable portion of the dirt work to be done before the bridge work could be undertaken, when upon the same day the State contracted with the dirt contractor for the performance of its work and gave that dirt contractor 360 days from that date to complete its work, the highway department knowingly created an impossible condition for which it should not escape liability. The highway department could not help but know that it was requiring the bridge builder to perform a contract under an impossible condition. On the other hand, the bridge contractor was only concerned with its engagement to build bridges and in accepting the contract as it was written, the contractor was entitled to believe and understand that the sites where the bridge work was to be conducted would be immediately available upon the date the contract was entered into and from which the time limitation of 160 days would run.

The judgment of the trial court should be affirmed.