William E. ANDRAU, Appellant
(Defendant),

v.

MICHIGAN WISCONSIN PIPE LINE
COMPANY, Appellee (Plaintiff),

William E. ANDRAU, Appellant
(Defendant),

v.

W.A. MONCRIEF, Jr.,
Appellee (Plaintiff).

Nos. 85–97, 85–98.

Supreme Court of Wyoming.

Jan. 16, 1986.

Neil J. Short, Casper, for appellant.

Richard L. Williams (argued) of Williams, Porter, Day & Neville, Casper, and George Hellstrom, ANR Production Co., Houston, Tex., for appellee in 85–97.

Thomas F. Reese (argued) of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellee in 85–98.

Before THOMAS, C.J., and ROONEY,* BROWN and CARDINE, JJ., and RAPER, J., Ret.

CARDINE, Justice.

These two cases are consolidated for purposes of this appeal. In both cases, appellant, a working interest owner, admittedly owes the appellees, operators, for drilling expenses he agreed to pay. Appellant claims, however, that the operators in each instance owe nonoperators a fiduciary duty which includes collecting debts, owed by him to the operators, in the least onerous manner. The court below did not find that appellees were required to collect the debt in the manner appellant asserted. Instead, the court found that, pursuant to the unit operating agreement, appellee Moncrief had a valid lien on all of appellant's working interests committed to the unit, and that Moncrief could foreclose this lien by selling this interest in accordance with the statutes dealing with foreclosure of real property mortgages.[1] Appellant has appealed from this judgment. We affirm.

## FACTS

Appellant is a nonoperating working interest owner in the Long Butte Unit, a gas reservoir in Wyoming. Appellee Moncrief is the operator of this unit and has managed the development of the unit under a unit operating agreement. The operating agreement provides that each nonoperator working interest owner is to be informed of the anticipated costs of each project by an authority for expenditure (AFE), and the working interest owner can then elect whether or not to participate. If the working interest owner chooses to participate, he is billed for his share of the costs, and he agrees to pay each bill within fifteen days after receipt. The agreement provides that the nonoperator grants the

"Unit Operator a lien upon its Committed Working Interests, its interest in all jointly owned materials, equipment and other property and its interest in all Production, as security for payment of Costs chargeable to it * * *." Article 15.5.

In addition to this unit operating agreement, the parties entered into a gas storage and balancing agreement which states that its purpose is "to permit each party to produce and dispose of its interest in the gas production from the unit area with as much flexibility as possible * * *." The storage agreement allows a party to produce and deliver to his purchaser that portion of the allowable gas production which is not produced by a party taking less than its full share. The party who sold less than its full share would be "underproduced" and have "gas in the bank," so that later he could sell more than his full share until the underproduction no longer existed. This storage agreement specifically states:

"13. Nothing herein shall change or affect a party's obligation to pay its proportionate share of all costs and liabilities incurred, as its share thereof is set forth in the Unit Operating Agreement."

Appellant, an experienced member of the oil and gas industry, was sent the AFE's for projects in the unit and executed each AFE, thereby agreeing to pay his share of the costs indicated. Although he agreed to pay these costs, appellant failed to pay the invoices sent to him. Under the terms of

---

* Retired November 30, 1985.

**1.** Appellee Michigan Wisconsin Pipe Line Company, like Moncrief, was the operator of a well in the same unit as Moncrief under a designation of operator from Moncrief. Both are admittedly owed drilling costs by appellant. Michigan Wisconsin has received a money judgment which, unlike Moncrief's judgment, does not state that the operating agreement created a lien upon appellant's working interest that could be foreclosed as a real property mortgage. However, the issue presented in both cases is the same regardless of the language in the judgments. The agreements relied upon in the opinion are identical in both cases, and any factual distinctions in the two cases do not affect our decision. The opinion will not unnecessarily detail these differences.

the operating agreement, the operator thus was granted a lien upon appellant's working interest committed to the unit and his interest in all jointly owned property.

Appellant does not contest the amounts that he owes, approximately $300,000 to Moncrief and $260,000 to Michigan Wisconsin Pipe Line Company. Nor does he claim that the operators breached any part of the agreements during any stage of the development or operation of the unit. Instead, he contends that the appellees must accept, as payment for his debt, the "gas in the bank" which he has as a result of being "underproduced" at this time. Appellant has some 60,000 mcf gas in the bank, which he values at $7.50 per mcf.

This underproduction was made possible by the operating and the storage and balancing agreements. The operating agreement provides that each party is to take in kind or separately dispose of his own share of production. Appellant failed to contract to sell his share of the production, while Moncrief did contract to sell his share for a price which represented the market at the time, but which is approximately three times greater than purchasers are willing to pay today.

Appellant contends that appellees must take appellant's "gas in the bank" as payment for his debt at a price of $7.50 per mcf, which is the average overall price for all gas sold from the Long Butte Unit. Evidence presented clearly showed that gas contracted for sale at the time of trial would sell for approximately one-third of $7.50 per mcf, or $2.50 per mcf. It is clear that if appellant's claim is upheld, the end result would be to force appellees to sell appellant's gas under the very favorable contract which Moncrief had the foresight to make for himself for the sale of his gas and underproduced gas.

After trial without a jury, the court entered a judgment and decree of foreclosure in favor of Moncrief and a money judgment in favor of Michigan Wisconsin. Appellant thus brings this appeal, urging the same claim upon which he relied below, and stating the issues as:

"I. Whether the appellee, as operator of the Long Butte Unit, stands in the position of a fiduciary or trustee in his relationship with appellant as a working interest owner in the Long Butte Unit.

"II. Whether appellee, as operator of the Long Butte Unit, is obligated to use the means least onerous to the appellant/working interest owner when collecting amounts due and owing by appellant.

"III. Whether the contractual arrangements between the parties have created a 'bank' which provides for the appellee/operator the source of funds to collect any debts due and owing by the appellant/working interest owner."

Appellees state the issues differently, but it appears they agree that the issues are those stated by appellant in I and II above.

## THE CLAIMED FIDUCIARY DUTY

Appellant claims that it is "well accepted that [a] Unit Operator stands in the position of a fiduciary or trustee to nonoperators." He places great weight on the cases of *Beadle v. Daniels*, Wyo., 362 P.2d 128 (1961); *Young v. West Edmond Hunton Lime Unit*, Okla., 275 P.2d 304 (1954); and *Reserve Oil, Inc. v. Dixon*, 711 F.2d 951 (10th Cir.1983), to support this claim. While these cases do support appellant's contention that there is often a fiduciary or trustee-type relationship between operator and nonoperator owners, they do not provide support for the fiduciary duty appellant claims is owed in this case. Appellant cites no authority, and this court has found none, which supports the proposition that an operator holding a valid lien upon a nonoperator's entire working interest cannot foreclose that lien, but must instead foreclose only upon the production obtained from the working interest. No court, to our knowledge, has ever imposed this duty. Even more important in this case, however, is the operating agreement which expressly negates such a duty. The agreement controls the disposition of this case.

First, we distinguish *Reserve Oil, Inc. v. Dixon,* supra. There, nonoperator working interest owners of an oil and gas well sued the operator alleging breach of a fiduciary duty when the operator sold the well's production in which the nonoperator had an interest but failed to turn over the proceeds of the sale to the nonoperator. The court stated that the contract gave the nonoperator full control over its proportionate share of the oil and gas and that the operator had no right to, or interest in, the oil and gas or its proceeds beyond a nonoperator's unpaid share of costs. The court went on to hold that the *"contract* created a trustee type relationship imposing a duty of fair dealing between the operator and non-operator owners in the matter of distribution of shares among the owners." (Emphasis added.) 711 F.2d at 953.

The court in *Reserve Oil, Inc. v. Dixon,* supra, expressly noted that it was simply construing the parties' contract. The contract created a narrow trustee-type relationship when the operator sold the nonoperator's production from the well. Nothing stated in the Reserve Oil, Inc. case supports the appellant's claim that the operator's fiduciary duty prevents him from foreclosing upon all of the nonoperator's working interest to satisfy debts owed for drilling costs.

Likewise, neither *Young v. West Edmond Hunton Lime Unit,* supra, nor *Beadle v. Daniels,* supra, found the broad fiduciary duty claimed here. In Young, the Oklahoma Supreme Court held that an operator of a unit forcibly created by statute holds a position similar to that of a trustee. The court found that the fiduciary duty owed by the operator was breached when it purchased production of the unit at a price lower than that offered by other purchasers. The court stated that the statutes (which compelled interest owners to surrender all rights to produce from the unit) required the operator to account to all owners for unit production at the highest market price available.

*Young v. West Edmond Hunton Lime Unit,* like *Reserve Oil, Inc. v. Dixon,* dealt

with an operator selling production belonging to a nonoperator. Both of those cases held that when the operator so acted, there was a trustee-type relationship which imposed certain duties upon the operator. But in the present case there is no claim that the operator was doing anything that was not strictly according to the parties' express written agreement. The gas he contracted to sell and sold was gas he owned or was authorized to sell for his own account per the agreement. If it included some of the nonoperator's share of production, the agreement provided a gas-in-the-bank arrangement to the nonoperator. The actions in the present case fall well outside of the areas in which there was found a fiduciary duty in *Reserve Oil, Inc. v. Dixon* and *Young v. West Edmond Hunton Lime Unit.*

In *Beadle v. Daniels,* supra, the operator, a corporation, was sued by nonoperators when the operator's officers purchased pumping equipment for less than that charged to the nonoperators. This court held that the officers of the operator owed a fiduciary duty to the operator, *and* that the operator was the agent for the nonoperators. We stated that the operating agreements were controlling in reaching our decision; and, therefore, we thought it "unnecessary to consider [the] suggestion that said agreements created a mining partnership * * *." 362 P.2d at 131.

The holding in *Beadle v. Daniels* was that the operating agreements imposed a fiduciary duty upon the operator which prevented the operator from charging nonoperators a higher price for pumping equipment than had been paid by the operator. Beadle does not stand for the proposition that a fiduciary relationship exists between operators and nonoperators irrespective of their express agreement. Beadle does, however, aid us in our decision in this case; the fiduciary duty claimed in the present case, like that in Beadle, is specifically dealt with in the operating agreement.

## THE AGREEMENTS

Parties are permitted to limit their fiduciary obligations by contract provisions specifically authorizing particular acts. *Frankfort Oil Company v. Snakard,* 279 F.2d 436 (10th Cir.1960). If the contract speaks to a particular point, the courts are "without power to rewrite the contract for the parties," id. at 444; and where the written agreement is clear, the parties must abide by the plainly stated terms. *Rainbow Oil Company v. Christmann,* Wyo., 656 P.2d 538 (1982). Of course, contracts which are contrary to public policy will not be recognized by the court. *Tate v. Mountain States Telephone and Telegraph Company,* Wyo., 647 P.2d 58 (1982). However, "[w]e will not invalidate a contract entered into freely by competent parties on the basis of public policy unless that policy is well settled * * *." *Sinclair Oil Corporation v. Columbia Casualty Company,* Wyo., 682 P.2d 975, 979 (1984).

In this case the parties specifically addressed the possibility of a nonoperator failing to pay his share of expenses which he agreed to pay. The contract provides that "[e]ach Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt." Appellant readily admits he failed to pay as provided in the agreement. The joint operating agreement also provides:

"15.5 Lien. Each of the other Parties hereby grants to Unit Operator a lien upon its Committed Working Interests, its interest in all jointly owned materials, equipment and other property and its interest in all Production, as security for payment of Costs chargeable to it, together with any interest payable thereon. Unit Operator shall have the right to bring any action at law or in equity to enforce collection of such indebtedness with or without foreclosure of such lien. In addition, upon default by any Party in the payment of Costs chargeable to it, Unit Operator shall have the right to collect and receive from the purchaser or purchasers thereof the proceeds of such Party's share of Production, up to the amount owing by such Party plus interest at the rate of 10% per annum until paid; each such purchaser shall be entitled to rely on Unit Operator's statement concerning the existence and amount of any such default."

■ This section of the operating agreement contains two provisions which are contrary to the duty appellant seeks to impose upon appellees. First, the agreement authorizes the operator "to bring any action at law or in equity to enforce collection of such indebtedness with or without foreclosure" of its lien upon appellant's interests. Appellant would have this court rewrite the agreement by limiting the operator's remedies because of a claimed fiduciary duty. Appellant is, in effect, asking this court to strike the right of the unit operator "to enforce collection * * * with * * * foreclosure" of his lien. We refuse to do so.

■ The agreement also provides that the operator, *in addition* to foreclosure, has the right to collect from the purchaser of the defaulting party proceeds attributable to that party's share of production. Appellant would, under his claim of a fiduciary duty, rewrite this provision to change this "right" of the operator into a duty to collect debts only in this manner. Apparently appellant would also require the operator to dispose of a nonoperator's share of production under the operator's contract to sell since, in this case, appellant has not contracted to sell his share of production. Again, this court refuses to rewrite the parties' contract as requested by appellant.

We find nothing in these provisions, dealing with collection of the debts of appellant, contrary to public policy. In fact, if we accept appellant's argument, we would disrupt the provisions of the operating agreement which allow nonoperator working interest owners to consent or refuse to consent to proposed projects. If the nonoperator consents, he risks the costs for his share of drilling, not knowing whether the well will be profitable. If he does not consent, he does not risk these costs, but he suffers a penalty because he is deemed to have relinquished, to the drilling parties, his working interests in the well until the

production attributable to his interest equals 400% of his share of the costs.[2] The loss of an additional 300% of their share of the costs of drilling serves as an incentive to working interest owners to provide the cash "up front" needed to drill wells. Appellant, in seeking to pay his share of the cost from production of the well, is attempting to avoid both the risk consenters take and the penalty imposed upon nonconsenters. This would obviously remove any incentive for working interest owners to consent and provide the needed cash for drilling additional wells.

We note that appellant contends that allowing foreclosure on his entire interest produces an unfair result because his interest is worth three to five times the debt owed. Appellant is not prevented from bidding at the foreclosure sale, or from convincing others of the high value he places upon his interest so that they are encouraged to bid. In dealing with this claim of unjust results, we query whether appellant would assert his "right" to sell his production under Moncrief's contract if the market value of gas had instead increased dramatically from the time of Moncrief's contract. It seems clear that if we were to accept appellant's argument, then those in his position would have the enviable choice of selling their share of production under the operator's contract, or under their own contract if the market value increases.

The remedies provided for in the agreement are clear and are not contrary to public policy; therefore, they are enforceable as written. Imposing the fiduciary duty for which appellant contends would effectively rewrite the parties' agreement—something we cannot do.

Appellant claims that the agreements created a bank which provides the appellee/operator the source of funds to collect any debts due and owing by the appellant/working interest owner. The storage agreement does provide that a party can be underproduced and thus be said to have "gas in the bank." Its stated purpose is to "permit each party to produce and dispose of its interest in the gas production * * * with as much flexibility as possible * * *." The storage agreement specifically states: "Nothing herein shall change or affect a party's obligation to pay its proportionate share of all costs * * * set forth in the Unit Operating Agreement." Clearly the agreement was not meant to provide a "bank" from which the operator must collect debts owed by working interest owners.

Finally, we deal with Moncrief's assertion that this court should treat this as a frivolous appeal and impose the costs provided in Rule 10.05, W.R.A.P.[3] Although we will enforce the provisions of Rule 10.-05, see e.g., *Skurdal v. State*, Wyo., 708 P.2d 1241 (1985), we rarely refuse to certify that there were reasonable grounds for appeal. *Osborn v. Warner*, Wyo., 694 P.2d 730 (1985). Rule 10.05 should not be used to discourage all appeals. We find that there were reasonable grounds for appeal; therefore, the additional costs of Rule 10.05 will not be imposed.

The claimed fiduciary duty does not exist. Therefore, the trial court did not err in failing to limit appellees to collecting their judgments only from appellant's share of production.

Affirmed.

---

**2.** Other courts have upheld the validity of this type of provision. See *Hamilton v. Texas Oil & Gas Corporation*, Tex.App., 648 S.W.2d 316 (1982).

**3.** Rule 10.05, W.R.A.P., provides in part:
"When, in a civil case, the judgment or final order is affirmed, * * * [u]nless the court certifies that there was reasonable cause for the appeal, there shall also be taxed as part of the costs in the case, a reasonable fee, to be fixed by the court, not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00), to the counsel of the appellee, and to the appellee damages in such sum as may be reasonable, not exceeding one thousand dollars ($1,000.00) * * *."