Bob BURG and Fred W. Boekel, d/b/a
Lakota Partnership, Appellants
(Defendants),

v.

RUBY DRILLING CO., INC., Jesse
Dale Ruby and Max L. Ruby,
Appellees (Plaintiffs).

RUBY DRILLING CO., INC., Jesse
Dale Ruby and Max L. Ruby,
Appellants (Plaintiffs),

v.

Bob BURG and Fred W. Boekel, d/b/a
Lakota Partnership, Appellees
(Defendants).

Nos. 88–220, 88–221.

Supreme Court of Wyoming.

Nov. 27, 1989.

David D. Uchner, Cheyenne, and Peter A. Bjork and Gregory Danielson of Poulson, Odell & Peterson, Denver, Colo., for appellants in case No. 88–220 and appellees in case No. 88–221.

Michael A. Maycock of Michael A. Maycock, P.C., Gillette, for appellees in case No. 88–220 and for appellants in case No. 88–221.

Before CARDINE, C.J., THOMAS, URBIGKIT and GOLDEN, JJ., and BROWN, J., retired.

GOLDEN, Justice.

This is an appeal and cross-appeal from a judgment generally in favor of an oil and gas drilling company, Ruby Drilling Company, Inc., (Ruby), Jessie Dale Ruby (Dale Ruby), and Max L. Ruby as individuals, in their action to recognize and enforce certain terms of a written agreement and an alleged oral agreement with an oil and gas partnership consisting of Bob Burg, Fred Boekel, and others d/b/a Lakota Partnership (Lakota), which owned the working interest in three oil and gas leases in Crook County, Wyoming. Also involved was Peter Young who had dealt with both Ruby and Lakota on those leases. Ruby sought to recover both development and operating costs incurred while working the properties under the written agreement, as well as assignments of certain undivided interests in some of the leases under the alleged oral agreement.

As will be explained in more detail later, the trial judge, after a bench trial and several post-trial hearings, ordered Lakota to assign Ruby and Max L. Ruby each a 20% working interest in two of the disputed leases. The trial judge granted: (1) Ruby a lien upon Lakota's interests in both of those leases for pre-production develop-

ment costs in the sum of $42,462.14; (2) Ruby $15,120 in post-production operating expenses from Lakota under a theory of quantum meruit; (3) Ruby $1,718.74 for Lakota's share of ad valorem taxes on production from one of the leases which was advanced by Ruby; and (4) Ruby $7,500 from Lakota for attorney fees associated with the lien issues under W.S. 29–3–103, plus $783.55 for costs. Finally, the judge ordered that the judgment shall constitute a decree of foreclosure of Lakota's working interests in Lease nos. 1 and 2. Proceeds of the sheriff's foreclosure sale were to be applied to the judgment, costs and expenses with any excess divided between the parties 60% to Lakota and 40% to Ruby and the individual plaintiffs. The trial judge refused to award Ruby or the individual plaintiffs: (1) as development costs, any money for the value of Ruby's equipment destroyed in a rig fire (which occurred during the development phase of work under the written agreement between the parties); (2) an assignment of a working interest in the so-called Federal lease; and (3) an additional $3,549.45 in attorney's fees under the lien issues.

In its appeal in case no. 88–220, Lakota seeks reversal of that part of the trial court's judgment granting Ruby an oil and gas lien for pre-production development costs of $42,462.14 upon Lakota's working interest in the two leases, rather than on production revenues as set forth in the written agreement. Lakota argues that, under the terms of the parties' express contract, if an oil and gas lien attaches at all, it attaches only to production revenues and should not require foreclosure and sale of Lakota's entire working interest in the two leases. Additionally, Lakota claims the trial court's written judgment failed to treat Lakota's 40% working interest in those two leases under the written agreement separately from appellant Peter Young's 20% working interest in those leases under that same agreement. Lakota argues this point in light of evidence in the record indicating an oral agreement between Young and Ruby under the purported terms of which Young paid certain sums

of money to Ruby for Ruby's rendering of certain services. Lakota asserts that, based on the evidence presented at trial, it remains unclear whether Young's oral agreement with Ruby was effective both before and after payout of production costs on the leases and was applicable to both pre-production development costs and post-production operating expenses. Consequently, Lakota asks this court to remand the case for additional findings of fact relating to: (1) determining the precise terms of the oral agreement between Young and Ruby; (2) conducting an accounting of payments made to Young and of payments Young made to Ruby; and (3) determining the date on which Young transferred his 20% working interest in a state lease to Lakota in exchange for an interest in a Federal lease.[1]

In contrast, in its cross-appeal in case no. 88–221, Ruby and Max Ruby seek to reverse those parts of the trial court's judgment refusing: (1) to grant Ruby an assignment of an interest in the so-called Federal lease; (2) to award Ruby the value of its equipment destroyed in the rig fire, and (3) to award Ruby an additional $3,549.45 in attorney fees.[2]

Comparing the foregoing appellate issues with the trial court's judgment, we conclude that neither party appeals from those features of the judgment awarding Ruby only 60% of the total development costs, awarding Ruby 100% of the operating costs on a quantum meruit basis,

awarding Ruby a working interest in two of the disputed leases, awarding Ruby 60% of the ad valorem taxes it advanced on Lakota's behalf, and awarding Ruby costs of $783.55.

In case no. 88–220, which is Lakota's appeal, we hold that the lien statute has no application to this set of facts. Accordingly, we reverse and remand those portions of the judgment ordering foreclosure and sale of Lakota's working interests in two of the disputed leases to satisfy the oil and gas lien. On remand the district court shall accomplish the appropriate division of the production revenues through the application of the parties' contract. We affirm on the remaining issues. In case no. 88–221, which is Ruby's appeal, we affirm the district court's decisions not to require Lakota to assign Ruby an interest in the federal lease and not to allow Ruby to recover its losses on equipment destroyed in the rig fire. Since we hold that the lien statute does not apply, we reverse and vacate the award of attorney's fees to Ruby. All other aspects of the judgment are affirmed.

## FACTS

The specific oil and gas leases involved here are located in the Tomcat Oil Field in Crook County, Wyoming. They include: (1) an August 1, 1983, lease covering the SW¼NE¼NW¼SE¼ of Section 15, Township 49 North, Range 65 West, 6th P.M. (Lease no. 1);

---

1. Lakota framed its appellate issues as:
   A. The district court's interpretation of the Letter Agreement dated May 18, 1988 is not consistent with the court's oral findings.
   B. The court's interpretation of the Letter Agreement fails to give effect to the parties' intent as expressed in all provisions of the Letter Agreement.
   C. The judgment fails to limit the extent of the oil and gas lien to the consideration expressed in the Letter Agreement dated May 14, 1984.
   D. The judgment fails to separately treat the working interest of Mr. Young and Lakota Partnership.
2. Ruby, Dale Ruby, and Max Ruby frame their appellate issues as:
   I. The Trial Court erred in finding that the parties did not have an enforceable agreement

which entitled the plaintiffs to have an interest in all three leases which were the subject of the action.
II. The Trial Court erred in finding that Ruby Drilling Co., Inc. assumed the risk as the driller and the operator as to the costs and expense of the fire which destroyed the drilling rig and further erred in finding that Ruby Drilling Co., Inc. breached the agreement by failing to insure against the loss.
III. The Trial Court erred in reducing the plaintiffs attorney fees from the amount shown by the affidavit of plaintiff's counsel of plaintiffs, insofar as proof of the reasonableness of the attorney's fees were properly submitted to the Court, and the evidence showed, and the court found, that 95% of the attorney's fees should be allowed.

(2) a "top lease" over an expired July 26, 1983, lease covering the SW¼SE¼S-E¼SW¼ of Section 10, Township 49 North, Range 65 West, 6th P.M. (Lease no. 2);

(3) a May 1, 1973, federal lease covering the NE¼SE¼ of Section 15, and the N½SW¼ of Section 14, Township 49 North, Range 65 West, 6th P.M. (Federal lease).

Lakota and Ruby had been involved in previous dealings on the lands covered by Leases no. 1 and 2 with a man named Grady Perkins; both had been unable to get Perkins to pay his bills. Recognizing that they were losing money to Perkins, Lakota and Ruby began negotiating an agreement that might allow each of them to recover their losses. While Lakota and Ruby were negotiating, Ruby began drilling and reworking wells on the lands covered by Lease no. 1. On August 31, 1983, Lakota submitted two written agreements to Ruby concerning the lands covered by Lease no. 1 and nearby land covered by Lease no. 2. Dale Ruby, acting for Ruby, made written amendments on these agreements, initialed the changes, and returned them to Lakota; Lakota did not agree to those amendments and no contract was reached. On September 28, 1983, Lakota assigned Ruby an undivided 20% interest in Lease no. 1.

Between the fall of 1983 and the spring of 1984, Lakota executed a number of assignments of the working interests in a group of leases covering lands near those at issue in this case. Some of these assignments granted Pete Young, Dale Ruby,[3] and Max Ruby each a 16.66% working interest and others granted the same three individuals each a 20% working interest. One of the assignments also contains a United States Bureau of Land Management designation of Ruby as the operator of that particular lease. Ruby would later contend

that these assignments evidenced an oral agreement between Lakota and Ruby to assign Dale Ruby d/b/a Ruby, Max Ruby, and Pete Young similar interests in Lease no. 2 and the Federal lease. There was also evidence that Ruby had posted a state water pollution control discharge permit bond for a water discharge pit on the Federal lease.

The parties finally reached an agreement concerning Lease no. 1 and put it in a writing dated May 18, 1984. That document was a hybrid agreement involving aspects of both a farmout agreement and an operating agreement. It provided that Dale Ruby d/b/a Ruby Drilling Company, Inc., would be the operator, that Lakota was the owner, and that Ruby, Max Ruby and Pete Young each owned a 17.1% working interest in that lease. Under the agreement, Ruby was to drill or rework ten wells on the Lease no. 1 lands and the parties agreed to the following formula for division of production and recovery of development expenses associated with bringing those wells into production:

5. [Lakota] agrees to allow [Ruby] to recover all of its costs and expenses of drilling, testing, completing, equipping and placing wells on production * * * revenues as set forth below:

(a) On production obtained prior to payout and after payout:

| PARTY | PERCENTAGE | INTEREST |
|---|---|---|
| Gene L. Payne) Sylvia Levinson) | 12.5 of 8/8 | Fee Royalty |
| M.E. Hoagland | 2.0 of 8/8 | Overriding Royalty |
| Lakota Partnership | 34.2 of 8/8 | (Overriding Royalty prior to payout and working interest after payout) |
| Max L. Ruby | 17.1 of 8/8 | Working Interest |
| Pete Young | 17.1 of 8/8 | Working Interest |
| Ruby Drilling Co. | 17.1 of 8/8 | Working Interest |

Dale Ruby,[4] Max L. Ruby and Pete Young, agree to allow Lakota Partners

---

**3.** The record does not indicate whether Dale Ruby took these assignments in his capacity as an officer for Ruby Drilling or as an individual.

**4.** The record does not indicate whether the use of "Dale Ruby" in this single-spaced paragraph, rather than "Ruby Drilling Co.," was pertinent to the parties' agreement over the way develop-

ment costs on Lease no. 1 wells would be recovered. The initial paragraph of the May 18, 1984, agreement indicates that Dale Ruby d/b/a Ruby Drilling Co. Inc., was the designated operator on Lease no. 1 and that the parties and the trial court appear to have litigated the entire lawsuit under the assumption that "Dale

to recover $35,000.00 based on 26.65% of the production, and Lakota Partners agrees to allow Dale Ruby, Max L. Ruby, and Pete Young to recover $55,000.00 based on 59.85% of the production. If the figures aforementioned are not recovered simultaneously, and Lakota Partners recovers their $35,000.00 prior to Dale Ruby, Max L. Ruby, and Pete Young recovering their $55,000.00, Lakota Partners agree to convert to a 10% overriding royalty until such time as Dale Ruby, Max L. Ruby and Pete Young recover their $55,000 in full. At such time as Dale Ruby, Max L. Ruby, and Pete Young recover their $55,000, Lakota Partners shall reconvert to a 34.2% working interest.

6. [Ruby] shall have full control of all operations on the subject lands and shall assume all liabilities whether expressed or implied as 100% working interest owner prior to payout. [Ruby] agrees that payout will be determined on a lease basis.

[Ruby] shall maintain in force and effect such policies of insurance as are reasonably necessary to protect the interests of the parties. Damage claims arising out of operations on the subject land shall be handled by [Ruby] and its attorneys, and settlement of claims of this kind will be within the discretion of [Ruby].

At this point, no agreement had been reached between Lakota and Ruby concerning the lands covered by Lease no. 2 or the Federal lease.

While negotiations on this agreement were pending, Young had been working on Lease no. 1 wells with Ruby and his hours were being invoiced by Ruby as a development expense. Ruby and Young invoiced this way even though they had reached their own oral agreement to enhance Ruby's ability to recover development expenses on Lease no. 1 wells sometime during negotiations between Lakota and Ruby on the operating agreement. Under this oral agreement, Young agreed to pay Ruby

10% of his 17.1% working interest in proceeds of production until Ruby and Max Ruby recovered their $55,000 in development expenses.

Young "worked" for Ruby under this arrangement until the summer of 1984; he apparently made one or more payments to Ruby under the oral contract until August 27, 1984. In late 1984 or early 1985, Young traded his entire 17.1% working interest in Lease no. 1 to Lakota for an interest in the Federal lease. The record is unclear concerning the total amount Young paid to Ruby under the oral agreement between its inception and the time he traded his working interest in Lease no. 1 to Lakota.

On July 12, 1984, one of Ruby's drilling rigs and two Ruby trucks were destroyed in a rig fire on a Lease no. 1 well. The fire was started by a Ruby employee who ignited gases escaping from the well with a welding torch. Ruby had not obtained insurance on its Lease no. 1 operations when the fire destroyed that equipment. Instead, Ruby billed each Lease no. 1 working interest owner for a proportionate share of the fire loss, apparently believing that the provision in the agreement allowing Ruby to recover its costs was grounds for that billing. Lakota objected to the billing under the "insurance" language in the Lease no. 1 agreement noted above, and based on its assertion that Ruby had fully depreciated the destroyed equipment before the fire. Lakota never paid Ruby anything for the fire damaged equipment.

The July 26, 1983, lease on the Lease no. 2 lands had a primary term that expired on October 20, 1984. In December 1983, Ruby hired an engineer to survey wellsites on the Lease no. 2 lands, apparently in preparation to drill wells and extend the primary term of the July 26, 1983, lease. In October 1984, those wellsites were staked, but neither Ruby nor Lakota had obtained state permits to drill. After Dale Ruby discussed this problem with Lakota, Burg completed and mailed two applications for

Ruby" and "Ruby Drilling Co." were synonymous in the May 18, 1984, agreement. We will

defer to that interpretation here.

permits to drill shallow oil wells on Lease no. 2 lands to the Wyoming Oil and Gas Conservation Commission; these applications showed Ruby as the operator on those potential wells. These applications were received on October 4, 1984, but neither was accompanied by the required twenty-five dollar fee. A Mr. Basko with the Commission contacted Dale Ruby about the missing fees and Ruby forwarded the money so that the drilling permits could be completed. The money was received on October 16, 1984, but the permits were not issued in time to allow Ruby to commence a well and prevent the July 26, 1983, lease on the Lease no. 2 lands from expiring.

At this point, there was some miscommunication between Ruby and Lakota. Dale Ruby inquired about the lease status of the Lease no. 2 lands and Lakota replied that there was not a problem. Dale Ruby apparently understood this to mean that the July 26, 1983, lease had in fact been extended. Actually, Lakota had obtained a new lease and had authorized Ruby to develop the wells described in the October 16, 1984, drilling permits. When Ruby went out to the Lease no. 2 lands to prepare to drill the two wells Pete Young was already there preparing the sites. Dale Ruby testified at trial that Pete Young felt he was proceeding under the new top lease on the Lease no. 2 lands. After Dale Ruby learned this, no wells were drilled by Ruby under the October 1984 drilling permits issued for Lease no. 2.

There was some production on Lease no. 1 wells during 1984. In early 1985, Dale Ruby discovered that Young had assigned his interest in Lease no. 1 to Lakota in return for an interest in the Federal lease. This apparently convinced Dale Ruby that Lakota was not going to assign Ruby, Dale Ruby, or Max Ruby any interest in the Federal lease, and on February 6, 1985, he filed an oil and gas lien on Lease no. 1 in an attempt to recover sums Lakota allegedly owed under the May 18, 1984, farmout operating agreement. Production revenues from Lease no. 1 have been held in suspension by the oil purchaser since that time. We have examined the record and find that none of the Rubys filed an oil and gas lien on Lease no. 2.

On August 1, 1985, Ruby, Dale Ruby, and Max Ruby filed a complaint in district court alleging their right to recover for the fire damaged equipment and asserting that a verbal agreement existed between Ruby and Lakota on Lease no. 2 and the Federal lease. Under this alleged verbal agreement, Lakota contracted Ruby as the operator on those two leases under terms similar to those contained in the Lease no. 1 farmout operating agreement. The plaintiffs also alleged that Lakota owed substantial amounts of money for expenses of development and operation on Lease no. 1 wells and prayed for judgment and an oil and gas lien against Lakota's interest in Lease no. 1. Lakota answered generally denying these claims, counterclaiming that the suit for a lien on Lease no. 1 lands was willful and malicious, and asked for compensatory and punitive damages. Ruby, Dale Ruby, and Max Ruby denied the counterclaim and the parties conducted discovery.

A bench trial took place on October 22, 24, and 29, 1986. The trial court sifted through the documentary evidence, listened to witnesses for both sides, and in open court made findings of fact and conclusions of law which were to serve as the basis for future hearings concerning the specific terms of the final judgment.

The parties met before the court again on November 12, 1986, to present evidence and arguments on the reasonable costs and expenses that would be used to arrive at a total dollar value for an oil and gas lien based on the terms of the May 18, 1984, farmout operating agreement. After that hearing, the parties made several exchanges of proposed forms of judgment but were unable to arrive at an acceptable written articulation of the trial court's October 29, 1986, findings. This problem resulted in a second post-trial hearing, July 22, 1987, in which counsel for Lakota argued that the form of judgment proposed by Ruby's and Max Ruby's counsel did not comport with the trial court's October 29, 1986, open court findings because it grant-

ed a lien for development expenses against Lease no. 1 itself and not against only the *production* from Lease no. 1. Next, the parties discussed the need for findings in the final judgment to reflect a 40% reduction in any expenses Lakota was to owe to Ruby and Max Ruby because Ruby and Max Ruby each possessed 20% of the working interests in wells on those leases and as working interest owners were responsible for their proportionate shares of those costs. The parties then engaged in a rather protracted discussion and argument over exactly what the trial court really did find and conclude on October 29, 1986. That colloquy was followed by a brief discussion of the attorney's fees recoverable by counsel for Ruby and Max Ruby on the litigation resulting in a lien on the Lease no. 1 production. Counsel for Ruby and Max Ruby referenced an affidavit on this matter signed on April 7, 1987, and Lakota's counsel made some arguments concerning the reasonableness of the fees explained in the affidavit.

The trial court considered the evidence and filed a final judgment on June 28, 1988. These appeals followed.

### CASE NO. 88–220

*Consistency of Relief Ordered in the Judgment*

■ Lakota first contends that the relief ordered in the final judgment is not consistent with the trial court's interpretation of the May 18, 1984, contract. Specifically, Lakota recounts that the trial court heard and reviewed voluminous evidence concerning the intention of the parties as manifested in the May 18, 1984, agreement and after hearing that evidence found:

> [Ruby], as the operator, gets to recover all of his costs and expenses of drilling, testing, completing, equipping, and placing the wells on production from the production revenues and that—I find the agreement of the parties was that they wanted to get a quick payout on attributed investments and they attributed an investment of $35,000 to [Lakota] and the 55,000 to Ruby [d/b/a Ruby Drilling Co.], Max Ruby, and Pete Young.

I do not construe that as putting a cap on the amount of—of legitimate costs of drilling, testing, completing, and equipping and placing that Ruby incurred. * * * I find that that was a way to ensure both of the parties of a quick payout.

> \*   \*   \*   \*   \*   \*

> I do not buy the argument that that was a cap, nor do I buy the argument that he was guaranteed that payment by the partners. *The agreement clearly says that it's to come out of the production revenues.* It appears we've approached that point, in any event.

(Emphasis added). That finding, among others, was incorporated into paragraph 13 of the final judgment. Lakota then directs us to the decretal portion of the final judgment which provides in pertinent part:

> WHEREFORE, IT IS ORDERED ADJUDGED AND DECREED as follows:

> A. Plaintiffs shall have judgment on their lien in the amount of * * * ($42,-462.14).

> B. Pursuant to W.S. § 29–3–103(a)(b)(i), plaintiffs shall have judgment for attorney fees in the amount of * * * ($7,500.00) plus cost in the amount of * * * ($783.55).

> C. Plaintiff [Ruby] shall have judgment on its quantum meruit claim for expenses of production in the amount of * * * ($15,120.00). In addition, plaintiff [Ruby] shall have judgment in the amount of * * * ($1,718.74), said amount being sixty percent of the total taxes paid. The total quantum meruit judgment is * * * ($16,838.74).

> \*   \*   \*   \*   \*   \*

> *IT IS FURTHER ORDERED that this judgment shall constitute a decree of foreclosure of [Lakota's] interests in [Lease 1 and Lease 2]*

> *IT IS FURTHER ORDERED that the sheriff proceed to foreclose and sell the property pursuant to Wyoming Statutes, the proceeds received from the sale shall first be applied to the costs and expenses of foreclosure and thereafter to the amount of the judgment.*

(Emphasis added). Lakota argues that by ordering foreclosure and sale of its working interests in Leases no. 1 and 2 to immediately satisfy Ruby's oil and gas lien for pre-production development costs, the trial court ignored its own finding that Ruby only had a contract right to recover those sums out of production revenues. We agree.

At the outset of our analysis of this issue, we must first observe that we are discussing the issue in the context of the oil and gas lien on Lease no. 1, but not Lease no. 2 since none of the Rubys filed a lien on Lease no. 2. As no lien was filed on that lease, the district court did not have jurisdiction to foreclose a lien on that lease in any event.

■ The court's primary function when interpreting a contract is to seek out the intent of the parties. *State v. Pennzoil Company*, 752 P.2d 975, 979 (Wyo.1988). When crafting its final judgment to effectuate that interpretation, the trial court cannot order relief that goes beyond the express findings it makes. *State Highway Commission v. Garton & Garton, Inc.*, 418 P.2d 15, 21 (Wyo.1966). Cf. W.R.C.P. 52(c). Pursuant to its findings, the trial court could only grant Ruby a contract right with priority to recover its pre-production development costs out of production revenues.

This conclusion requires us to consider a potential jurisdictional matter, which neither party has expressly raised, but which we believe must be addressed to insure finality in this appeal. See, e.g., *Ricci v. New Hampshire Insurance Company*, 721 P.2d 1081, 1088 (Wyo.1986) (this court can address an issue not raised by the parties below if it involves the trial court's subject matter jurisdiction). Lakota could have argued that the trial court did not have statutory authority to impose an oil and gas lien for the development costs Ruby is entitled to recover from the proceeds of production, based on the theory that the trial court interpreted the May 18, 1984, agreement to be essentially a farmout agreement and not an express contract for Ruby's materials and services in bringing the wells on Lease

no. 1 into production. The thrust of this argument would have been that the contract debt for development costs that Ruby can recover out of production is not a "debt" eligible for the statutory protections of the oil and gas lien statute. Under a normal farmout agreement no separate debt exists because the farmee assumes the risk that it might lose its development costs in exchange for the possibility that it will attain production and receive an outright share of the working interest in the lease. See *Johnson v. Anderson*, 768 P.2d 18, 22 n. 3 (Wyo.1989) (citing 8 H. Williams and C. Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms* at 342 (1987)).

This case is not that simple, however, because of the confused nature of the May 18, 1984, agreement, which, as reflected by the trial court's findings, has characteristics of both a normal farmout agreement and an operator's agreement. It forces Ruby to risk development costs on Lease no. 1 in order to receive an assignment of a percentage of the working interest in that lease, *but* it also gives Ruby an express contractual right to recover those development costs out of any production that does result from Lease no. 1 exploration under a specific payout formula.

This presents an interesting legal dilemma. The agreement seems to create an express contractual right in Ruby to recover development costs which arguably demands protection under the language of our oil and gas lien statute, and if that is the case, the lien statute allows foreclosure against the entire working interest in the lease to which the lien attaches. See W.S. 29–3–103 and W.S. 29–3–105 (May 1984 Repl.). Allowing Ruby to foreclose such a lien, however, would arguably sanction unjust enrichment because it would allow Ruby to foreclose against Lakota's working interest in Lease no. 1, when Ruby's express contractual right underlying the lien applies only against production revenues.

■ This leaves us with essentially two options in terms of the operation of the oil and gas lien statute for resolving this case. The first would be for us to hold that the

character of Ruby's contractual right is more analogous to the farmout situation than an operator or contractor situation, and therefore, Ruby's contract right to recover development costs out of production did not confer the trial court with statutory jurisdiction to grant a lien. This thesis involves holding that there was no contract debt upon which Ruby can now ground its request for a statutory lien. The other alternative is to apply the plain language of the lien statute, but to limit the relief available to Ruby in this situation under that statute to that which it bargained for in the May 18, 1984, written agreement. When considering these alternatives, we are also cautious of construing the lien statute in a way that may damage its utility under more "normal" circumstances, where it serves as a more immediate remedy to an oil and gas contractor who has not been paid for materials and supplies which help bring a lease into production. Lien statutes create remedies in derogation of common law and must be strictly construed. *Cities Service Oil Company v. Pubco Petroleum Corporation,* 497 P.2d 1368, 1371–72 (Wyo.1972).

■ After carefully considering our options, the plain language of the lien statute, and the unique circumstances of this case, we hold that the trial court did not have jurisdiction to apply the oil and gas lien statute, and could not order relief under such a lien. The trial court specifically found that Ruby has an express contractual right to recover its pre-production development costs out of production revenues which Lakota has already received or which are currently being held in suspension by an oil and gas purchaser pending resolution of this litigation. Further, Lakota does not assert the nonexistence of a debt to Ruby under the contract.

Ruby possessed an express contractual right to recover its development outlays from production revenues which qualifies for a contractual remedy. That remedy, however, should not expand the express contractual right Ruby bargained for into a guaranteed payment of those expenses by allowing Ruby to foreclose against Lako-

ta's entire working interest in Lease no. 1. We recognize that the usual contract between a provider of services or materials to develop an oil and gas lease and the owner of an interest in the real estate covered by the lease provides the underpinning for a statutory oil and gas lien. See W.S. 29–3–103; W.S. 29–3–110; *Cities Service,* 497 P.2d at 1373. The parties' agreement as to how they would divide production revenue under the formula expressed in their contract did not change Ruby's status as a farmee with respect to what it had to do to acquire its working interest. Traditionally, a farmee's expenditures do not come within the embrace of the lien statute. Since the amounts owed to Ruby were conditioned upon production, the lien statute has no application to this set of facts. If Ruby wanted the ability to foreclose against Lakota's working interest to recover development costs with an oil and gas lien, it should have contracted for that circumstance rather than contracting for a hybrid farmout operating agreement.

On remand, when the trial court reconsiders the relief it will order to effect Ruby's judgment for development costs to make that relief consistent with its interpretation of the May 18, 1984, agreement, it must limit the scope of that relief to production revenues only. Neither this court, nor the trial court, have an obligation to rescue Ruby from the terms of an undesirable contract into which it voluntarily entered.

### Trial Court's Interpretation of the May 18, 1984, Agreement

■ Concerning Lakota's additional contentions that the May 18, 1984, written agreement can be interpreted differently from the interpretation chosen by the trial court, we decline Lakota's invitation to retry the case at the appellate level. The trial court persevered through a morass of confused documentary and testimonial evidence in this case presented by parties who themselves did not know what their actual business relationship was. Other than the inconsistency in the judgment discussed above, the trial court arrived at an interpretation of the contract that was supported

by the evidence; Lakota has not challenged the trial court's interpretation of the contract on that basis and doing so would not help it under the applicable standard of review which ignores conflicting evidence presented on appeal by Lakota and gives Ruby every reasonable inference we can draw from the evidence supporting the trial court's findings. *See Pancratz Company, Inc. v. Kloefkorn–Ballard Construction/Development, Inc.*, 720 P.2d 906, 908–09 (Wyo.1986). We decline Lakota's invitation to retry this case on appeal and defer to the trial court's interpretation of the contract terms. Lakota should not be heard to complain about the trial court's interpretation of a written contract that it drafted. See *Pennzoil*, 752 P.2d at 979–80 (ambiguities in written contracts are construed most strictly against the drafter).

### Effect of Young's Collateral Oral Agreement With Ruby

■ Lakota's next issue questions whether the trial court rendered judgment as to the amount of damages for development costs without adequately considering the payments Ruby may have already received from Young under their collateral oral agreement. Lakota fails to present any justification for this court to open the judgment as to the amount of development costs other than the general assertion that some evidence exists in the record which might justify that action. Consequently, Lakota fails to present this issue with cogent argument or cited authority and we need not consider it further. *Johnston v. Conoco, Inc.*, 758 P.2d 566, 568 (Wyo.1988).

### CASE NO. 88–221

### Farmout Operating Agreement as to the Federal Lease .

■ Ruby and Max Ruby begin this appeal by challenging the district court's finding that there was no oral or written agreement between them concerning development or production of the lands covered by the Federal lease. In a direct appeal from a final civil judgment this court assumes that the evidence of the prevailing party below is true and gives that party every reasonable inference that can fairly and reasonably be drawn from it. *Pancratz*, 720 P.2d at 908–09. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. *Id.*

Ruby and Max Ruby urge us to reanalyze the evidence presented at trial and somehow draw the collective inference that they had a collective agreement with Lakota that required Lakota to assign them up to 50% of the working interest in the Federal lease. Whether an oral or written contract has been entered into depends on the parties' intent and is a question of fact. *Wyoming Sawmills, Inc., v. Morris*, 756 P.2d 774, 775 (Wyo.1988). The finder of fact in this case was the trial court, which heard all of Ruby's evidence allegedly supporting the existence of an oral contract as to the Federal lease. The trial court rejected that evidence and we defer to that finding.

### Ruby's Liability for Losses Incurred in the Rig Fire

■ The next issue in this case is Ruby's challenge to the trial court's determination that, under the plain language of the May 18, 1984, operating agreement quoted above, Ruby both assumed the risk of equipment loss on Lease no. 1 operations due to a rig fire and Ruby breached its contractual obligation to obtain insurance to cover such a loss. We need only affirm one of these bases for the trial court's conclusion to affirm on this issue and we choose the second.

Courts review contractual language to ascertain the true intent of contracting parties; when contractual language is unambiguous its plain meaning evidences that intent. *Pennzoil*, 752 P.2d at 978. The trial court found the May 18, 1984, operating agreement to be an unambiguous contract between Ruby, Max Ruby, and Lakota concerning development of Lease no. 1. As quoted above, that contract required Ruby to maintain insurance in both parties' interests in the development of Lease no. 1. Ruby failed to maintain insurance coverage

for the type of loss suffered in the rig fire and consequently breached its obligation to do so under the plain language of the contract. That breach precludes Ruby from recovering its rig fire losses from the other parties to the operating agreement. See *Western Plains Service Corporation v. Ponderosa Development Corporation,* 769 F.2d 654, 658 (10th Cir.1985).

### *Attorney's Fees Under W.S. 29–3–103*

Ruby prayed for attorney's fees in this case based on W.S. 29–3–103(a) (May 1984 Repl.), which provides for them if an oil and gas lien is granted. Since we hold that Ruby was not entitled to a lien under the peculiar facts of this case, we conclude that Ruby was not entitled to attorney's fees.

### CONCLUSION

In case no. 88–220, we reverse the judgment and remand with instructions that the district court accomplish the appropriate division of the production revenues through the application of the parties' contract. We affirm on the remaining issues. In case no. 88–221, we reverse and vacate the award of attorney's fees to Ruby. We affirm on the remaining issues.

THOMAS, J., filed a specially concurring opinion, in which URBIGKIT, J., joins.

THOMAS, Justice, specially concurring, with whom URBIGKIT, J., joins.

I concur in the result reached in the majority opinion. There is no justification for invocation of the lien by Ruby Drilling Company in this instance. The conclusion that the parties are limited to their contractual remedies is eminently correct. That deduction is factually proper, but it is the function of the trial court to make factual conclusions. The propriety of that determination as a matter of law is essential to our disposition.

The legal justification for our ruling is found in the relationship of the parties as co-owners of the working interest in the lease. The effect of the May 18, 1984 agreement, in addition to limiting Lakota's and Ruby's contractual rights, was to establish a relationship "sufficiently similar to a partnership to constitute a joint venture." *Texas Oil & Gas Corporation v. Hawkins Oil & Gas, Inc.,* 282 Ark. 268, 668 S.W.2d 16, 17 (1984). The sharing of the income and expenses of a working interest in an oil and gas lease by the co-owners of the working interest in the same proportions as their ownership interests is the essence of a joint venture. The agreement outlined the respective rights of the parties in relation to their joint venture for developing and producing Lease No. 1.

Joint ventures are like partnerships, and they embody a reciprocal fiduciary duty of fair dealing among the members of the entity. *Madrid v. Norton,* 596 P.2d 1108 (Wyo.1979). According to recognized commentators, the fiduciary relationship is the most important characteristic of a joint venture. 2 H. Williams & C. Meyers, Oil and Gas Law § 437.1 (1988). The May 18, 1984 agreement does not recognize a right of either party to assert a lien against the joint venture property. In the absence of the reservation of such a right, the assertion of a lien against the joint venture property would amount to a violation of the fiduciary duty owed, and the assertion of the lien would be recognized as a breach of the joint venture agreement. Cf. *Andrau v. Michigan Wisconsin Pipe Line Company,* 712 P.2d 372 (Wyo.1986) (court holding no breach of a fiduciary duty resulted from the assertion of a lien because the agreement of the parties clearly provided for the assertion of a lien).

In the absence of a contractual provision that permits one joint adventurer to assert a lien against the other, sound policy reasons exist to limit the parties to the remedies provided in their contract or by the general law of partnerships. The court should not recognize an effort at self-help that violates a fiduciary duty owed to the other party. Since that is the result reached by the majority opinion, I am pleased to concur in the disposition of this case.